16 CV 5741

JUDGE TORRES

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

TATIANA DINS                    Plaintiffs, )
)
)
v,                                          )
)
BANK OF AMERICA, N.A., WILMINGTON )     VERIFIED COMPLAINT AND DEMAND
TRUST COMPANY AS TRUSTEE FOR )              FOR JURY TRIAL
CWHEQ REVOLVING HOME EQUITY )
TRUST, SERIES 2006A, and Does 1 through )
100 Inclusive,                          )
                    Defendants.         )   Civil Action No. _____
                                        )
                                        )
                                        )
                                        )

FILED
U.S. DISTRICT COURT
S.D. OF N.Y.
2016 JUL 19 PM 1:5

The Plaintiff Tatiana Dins (hereinafter referred to collectively as "Plaintiffs" or

"Borrowers"), as and for their Verified Complaint submitted pursuant to Federal Rules of Civil

Procedure Rule 15 against Bank of America, N.A., Wilmington Trust Company as Trustee for

CWHEQ Revolving Home Equity Trust, Series 2006A, and "DOES 1 THROUGH 100

INCLUSIVE" allege as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, as

well as the specific grants of federal court jurisdiction under the federal laws

represented by TILA, RESPA, HOEPA, the Securities Act of 33, the Wire Act, the

Mail Fraud Act, Bank Fraud, as this is a civil action arising under the laws of the

United States. This Court has supplemental jurisdiction of the state law causes of

action asserted herein pursuant to 28 U.S.C. § 1367(a) as these claims are so related

and so inexorable intertwined to the federal claims that they form part of the same

case or controversy under Article III of the United States Constitution.

2. This Court also has jurisdiction over the claims, because this case involves New York common law trusts.

3. Plaintiffs can and will amend this Complaint as the facts of actual violations of any of the above listed federal laws/statutes become known or ascertained as they occurred prior to the filing of this lawsuit and/or during the course of litigation from any of Defendants' so named failed to perform conditions precedent under Federal Law to resolve certain matters in dispute with Plaintiffs and warrant any named Defendants and each of the fictitiously named Defendants are responsible in some manner for the injuries and damages to Plaintiffs so alleged and that such injuries and damages were proximately caused by such Defendants, and each of them.

4. Venue is proper in this District under 28 U.S.C. §1391(b)(1), because Defendants are residents of and/or conduct business in this District. This Court has personal jurisdiction over Defendants, because they are residents of and/or conduct business in this District and under N.Y. C.P.L.R. 301, New York's long arm statute. The claims also relate to Defendant's role as trustee over a trust created under New York law and/or administered at least in part in New York.

## PARTIES

5. Plaintiff resides at 2709 Jackson St., San Francisco, Ca. 94115 and are, in all respects material hereto, sui juris.

6. Defendant Wilmington Trust Company, as trustee for CWHEQ Revolving Home Equity Trust, Series 2006A "trust") is a securitized trust organized and existing under the laws of New York, and is doing business throughout this district. Defendant

can be served with process at  Rodney Square North, 1100 North Market St., Wilmington, DE., 19890-001.

7. Defendant  Bank of America, N.A.(hereinafter referred to as "BOA", servicer, is doing business throughout the district and can be served through its registered agent at CT Corporation, 111 8th Ave., N.Y., N.Y. 10011..

8. Defendants Does 1 through 100 inclusive are individuals or corporations that aided and abetted in the civil conspiracy to deny Plaintiffs' due process..

9. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned, each of the Defendants were the agents, employees, servants and/or the joint-ventures of the remaining Defendants, and each of them, and in doing the things alleged herein below, were acting within the course and scope of such agency, employment and/or joint venture.

INTRODUCTION

1.  MISCONCEPTION THAT ONLY BORROWERS ARE AT FAULT

10.      Some may consider this matter as a simple issue of whether courts and laws should help *"irresponsible,"* gullible people who got way over their heads in debt and into expensive home purchases and mortgage loan transactions that they should never have considered when they *"knew"* or *"should have known"* that they could not afford such luxuries and extravagances. Thus, since they *"knew"* that they could not really afford what they got into, they need only blame themselves for what has happened to them. The issue may then be simply framed whether those directly involved in getting the Plaintiffs into

impossible and implausible financial dilemmas that eventually lead to unaffordable situations and possible foreclosure of their homes, are entirely blameless and should be left alone to benefit from the "fruits of their fraud" without repercussions or accountings of any type. In the case of some class members, their foreclosures have already taken place.

## 2. BASIC ISSUES BEING CHALLENGED BY THIS LAW SUIT

11. This case, however, is not that simple. In fact, when viewed in the totality of the circumstances, this matter is not simply a case of innocent, hard working, honest, home purchasers and borrowers being duped and being taken advantage of by unscrupulous individuals and lending companies. This case deals with arrogant, irresponsible and greedy companies that made predatory, toxic and ultimately unaffordable loans to these Borrowers, and preyed on gullible, unsophisticated consumers, and as such it is a action challenging, among other things, the:

a. Standing, at the outset, of any putative person or entity that claims to have the power to enforce through foreclosure, the default rights under the applicable mortgage promissory notes (and the deeds of trust) in a securitized mortgage, REMICS or Conduit Loan scheme in Wilmington Trust Company, N.A.. as trustee for CWHEQ Revolving Home Equity Loan Trust, Series 2006-A.

b. Legality of failure to disclose the *aggregate costs* of the transaction involved and any accompanying subordinate financing schemes to purchase or refinance a residential dwelling, which, *but for* the subordinate financing, the transaction as a

whole would not have taken place. Simply put, if the only way you can afford to buy a house is with a second loan, then the costs of that loan should be included in the "costs" of the first loan so the buyer can make an informed decision.

    c.    Legality of failure to completely account for the aggregate costs of a transaction which purports to *disclose* a "yield spread premium" ("YSP"), but yet entirely fails to include that YSP in the calculations applicable to the Truth in Lending Act Disclosures ("TILA Disclosures");

    d.    Legality of failure to disclose the applicable "par value" of a loan transaction before the transaction is made or completed.

    e.    Legality of the failure to properly account for, disclose, and calculate or list all the quantifiable reasons for the difference that exists between the YSP and the "par value" costs of a loan so as to properly and adequately inform Borrowers the reasons or guidelines as to why they obtained an "above par value" pricing for their particular loan; especially if, as stated in the loan applications which are the subject of the present Complaint,

    f.    Legality of whether a "pool" or "tranche" of securitized mortgage backed securities, whose associated pool has been paid by its "loss of value insurer," or various "credit enhancement policies" may still foreclose on homes belonging to that pool in a double payment, triple payment or even quadruple payment scheme. That is to say, if the investments have already been paid off or "bailed out" by their "securitized pool insurer or credit enhancement policy or guarantee" or "bail out federal government entity", are the putative investors still entitled to foreclose on consumers that have not been "bailed out." Further, if the investors have already been

paid once, why do they continue to have the right to get paid out yet a second time if they already had required "loss reserves" insured against the possibility of default; and that is even before a foreclosure is completely processed. To add insult to injury and add profits for the nefarious actors in these schemes, a foreclosure essentially effectuates a potential payment of yet a third time on the same notes, pools, or tranches of securitized mortgage backed securities. And because of how the Internal Revenue Code is written (e.g. Internal Revenue Code of 1986 Sections 860D and 1031) and applied to these Conduit Loan activities, these profits are potentially tax free to the pool owners or investors, giving them yet a fourth source of profit distribution to the investors that purchase the securitized debt obligations in a securitized mortgages pool scheme. Considering the "bail out" payments and the totality of the circumstances, the Defendants' behavior is not just egregious, unconscionable, arrogant, irresponsible, and greedy; it is outright robbery and theft being perpetrated against innocent and unsuspecting victims: 1) the people who signed up for these loans and 2) the American taxpayer.

g.    Legality of whether a merely putative "holder or servicer of the Note" but not the direct "beneficiary of payments of the Note", has the *standing* to enforce *any* provisions of the Note, including the power to enforce the Note by foreclosure; especially when the original Promissory Note is lost. For example, within the housing market itself, just because you are a "holder/tenant" of a house, do you have the right to sell the house?  More to the point, just because you are a Property Manager of a group of houses, responsible for collecting payments, paying insurance and taking care

of maintenance fees and repairs, do you have the right to foreclose and or sell a house
on behalf of the house owners you never met and you never contracted with?

h.      One sided practical application of the 33 Act §10 disclosures and SEC
Rule 424(b)(5). Specifically, when applied to the mortgage securitization industry, the
prospective pool issuer or sponsor of the REMIC pool or Conduit Loan must comply
with the disclosure requirements of the 33 Act by filing a "424(b)(5)" prospectus or
private placement memorandum. That Rule 424 filing warns any prospective investors,
before the prospective investor buys securitized mortgage certificates, that certain
loans in the proposed securitized mortgages pool possessing Negative Amortization or
interest only loan characteristics present a "...*likelihood of default, especially in the
early years*...." Yet, in violation of the 33 Act §10 itself, potential borrowers are *never*
warned or told that their loan type is likely to fail or likely to default regardless of the
borrower's high credit score, intention, and valiant effort to pay the mortgage loan.
This failure to "trickle down" and "enforce the warnings and disclosures" as against
mortgage loan borrowers is in direct contravention of the 33 Act §10 itself which
states:

> In the exercise of its powers ..., the Commission shall have
> authority to ...prescribe ... the form and contents which it may
> find *appropriate* and *consistent* with the *public interest* and the
> protection of investors [emphasis added].

i.      Warning borrowers that their loans are likely to default because of the
nature and characteristics of their loan itself is appropriate and consistent with the

public interest. These failures of any putative interested party to have the legal standing to foreclose on defaulting mortgage promissory notes which are part of a mortgage securitization scheme; failures to make otherwise valid loans to finance home purchases or refinancings; failures to aggregate financing costs; failures to account for and aggregate *ab initio* for the cost effects of subordinate financing in a given transaction; failures to adequately create, maintain, and monitor *any indicia* of quality and/or quality control for those individuals and entities originating loans so that loan applications would be accurately and truthfully completed; failures to properly disclose all other hidden costs in connection with the financing of a consumer transaction; failures to give timely Truth in Lending Disclosures or Good Faith Estimates; failures to properly state the immigration status of certain individuals when stating that certain individuals are US Citizens when in reality they are Legal Permanent Residents or even Undocumented Aliens of this country; failures to make sure that bank statements would not be altered, falsified, or otherwise improperly completed or tampered with so as to show higher than existing savings and checking account balances at the time of loan application; failures to show the proper and chronological "chain of custody" of a Promissory Note in the securitized mortgage backed securities market so as to unquestionably give the right to the "holder" of the Note to enforce the Notes by foreclosure when the Notes default; and failures to account for "bail out" fund payments, credit enhancement payments (e.g. securitized mortgage pool default insurer), loss reserve fund payments, and getting paid out perhaps no less than three (3) times on the same mortgage notes when a foreclosure is

instituted against the Plaintiffs, are in direct violation of TILA, RESPA, HOEPA, federal and state Bank Fraud laws, and others.

j.     Additionally, this suit also raises issues of actual fraud and artifice designed and perpetrated by various parties acting in concert and preying upon unsuspecting borrowers. These securitized mortgage pools were set up in a manner which allows them to function as racketeering activities in glorified pyramid and ponzi schemes operating under the color of law. Further, these deceiving, underhanded, and egregious activities generated (and continue to generate) payments that had the effect of artificially inflating the cost of the consumers' loans, and reap for the Defendants quite substantial, illegal, unconscionable, on-going, and improper profits at the expense of the Plaintiffs. As we now know from the mortgage mess we are all experiencing, these illegal profits are ongoing. Most disconcerting, all these violations had the immediate and incurable effect of ruining innocent peoples' lives; ruining Plaintiffs American dream of owning a home they could afford; ruining Plaintiffs credit, credit histories, and credit scores; exhausting any family savings and retirement funds; and ruining Plaintiffs health given the enormous stress as Plaintiffs will likely be rendered homeless due to foreclosure of their homes at any given moment because of their inability to pay the mortgage loans that Defendants set up for them.

## GENERAL ALLEGATIONS

44. The loan to Plaintiffs were underwritten without proper due diligence by non-party Countrywide Home Loans, Inc.  failed to verify the Borrowers' income

utilizing signed IRS Income Tax Disclosure Form 4506T which would have provided past Borrower tax returns. Countrywide Home Loans, Inc. also used a "GDW Cost of Savings" as the Index for the basis of this loan. Because the Lender controlled this Index and it is directly based upon the average rate of interest LIBOR, it was not a valid index for the basis of the loan.

45. On Nov. 25, 2015 the Plaintiffs obtained a securitization audit from Certified Forensic Loan Auditors (see Exhibit B), which shows that on Jan. 20, 2006 Countrywide Home Loans, Inc. made a mortgage in the amount of $1,000,000. Only Countrywide Home Loans, Inc. (pg. 21-23__ of audit) had standing to assign the mortgage deed. This represents a break in the chain of title and a legitimate action for wrongful foreclosure. There is also evidence that the loan did not make it into the CWHEP Revolving Home Equity Trust, Series 2006A by the closing date of Feb. 27, 2006 and there is securitization fraud on this particular loan. A Trustee's Act that is contrary to the trust agreement is void. (N.Y. Estate, Power, in Trust Law 7-2.4). In the Affidavit of (Exhibit B) Plaintiff did receive a loan with negative amortization and was lured in with a low starter rate which very soon Ms.Dins owned more than the house was worth. Later modifications attempts put her even further under water on the property. Notices to the trustee Wilmington Trust Company for debt validation which have not been properly responded to and represent serious violations of F.D. C.P.A. Further Countrywide Home Loans, Inc. can only assign that which it has. Countrywide Home Loans, Inc. was granted to power and authority to record the mortgage **ONLY**. Therefore, all it could assign to any other entity would be the

power and authority to record the mortgage. This further demonstrates the break in the chain of title.

46. There have been further flaws in the Assignments of the Plaintiffs loan as well as documents or Affidavit or Declaration by an official representative with first-hand knowledge of business records of the Plaintiffs to show the purported loan was in default. Plaintiffs' Affidavit (Exhibit B) best documents the time line and accusations. At closing, Plaintiff Dins was never told her loan was being funded by a warehouse line of credit and believed Countrywide Home Loans, Inc. was the actual lender. Nor was she told the note was being assigned to MERS. This assignment is a questionable assignment and represents another break in the chain of title  With the collapse of the economy in 2008 Ms. Dins was able to obtain three modification none of which reduced principle and due to the original loan being an adjustable rate with negative amortization she is now underwater on the property. In addition, and unbeknownst to Plaintiffs, COUNTRYWIDE HOME LOANS, INC. illegally, deceptively and/or otherwise unjustly, qualified Plaintiffs for a loan which COUNTRYWIDE HOME LOANS, INC. knew or should have known that Plaintiffs could not qualify for or afford by, for example, the underwriter has approved this loan based upon credit scores and the borrower's Stated Income only. Had COUNTRYWIDE HOME LOANS, INC. used a more accurate and appropriate factor, such as Tax Forms and a formative level of scrutiny to comply with the requirement of providing Plaintiffs with a Mortgage Loan Origination Agreement in analyzing the debt to income ratio, Plaintiffs would not have qualified for the loan in the first place. Consequently, COUNTRYWIDE HOME LOANS, INC. sold Plaintiffs

a loan product that it knew or should have known would never be able to be fully paid back by Plaintiffs. COUNTRYWIDE HOME LOANS, INC. ignored long-standing economic principals of underwriting and instead, knowingly, liberally, greedily and without any regard for Plaintiffs' rights sold Plaintiffs a deceptive loan product.

47. At all times material hereto Defendants knew of BANK OF AMERICA, N.A.'s actions and participated in them.

48. Wilmington Trust Company as trustee, et al is the successor in interest to COUNTRYWIDE HOME LOANS, INC. and responsible for the actions of BANK OF AMERICA, N.A..

49. On or about Jan. 20, 2006 (the "Closing"), Plaintiff refinanced the property located at 2709 Jackson Ave., San Francisco, Ca. 94115 hereinafter the "Property"). The Property was acquired with a mortgage loan in the sum of $1,000,000 originated by COUNTRYWIDE HOME LOANS, INC. (the "loan"). The Assignments are as follows:

a.   On or about Nov. 25, 2015 Michael Carrigan, signed (Exhibit C) an Affidavit as expert witness for Certified Forensic Loan Auditors, that through a Bloomberg audit he was able to determine the Dins loan had been assigned to (12) twelve classes . The report alleges numerous instances of securities fraud subject to New York law.

b.   On January 31, 2006 Instrument # 2006-1120615, REEL J067 IMAGE 165, Official Records, San Francisco County, a Deed was recorded by Countrywide Home Loans, Inc. for $1,000,000 with an assignment to MERS Min# 1000157-0006048348-0. The forensic audit (Exhibit C) page 33 states, "The written agreement

that created the CWHEQ Revolving Home Equity Trust, Series 2006-A is a "Pooling and Servicing Agreement" (PSA), and as a matter of public record, available on the website of the Securities Exchange Commission. The Trust is also described in a "Prospectus Supplement" also available on the SEC website.  The Trust by its terms set a "closing date" of February 27, 2006.  The promissory note in this case became trust property in compliance with the requirement set forth in the PSA.  In view of the foregoing, the Assignment of Deed of Trust executed after the Trust's Closing Date would be a void act for the reason that it violated the express terms of the Trust agreement.

50. At all times material hereto, the Trust was required to comply with the terms and condition of its Pooling and Servicing Agreement ("PSA"). The PSA sets forth all of the criteria which each loan which is transferred to the PSA must meet, and further sets forth the procedures that must be filed for each loan that is transferred to the PSA. The PSA which is the subject of this loan is not filed with the SEC. The Prospectus Supplement can be found at http://www.sec.gov and is incorporated herein.[1]

51. In addition the Trust was required to comply with NY Trust Law with regard to the acquisition of the subject loan.

52. At all times material hereto, the servicing of the loan was also subject to the terms and conditions set forth in the PSA.

53. Trust and  Bank of America, N.A. claim that they are the Owner and Servicer, respectfully, for the Plaintiffs' Mortgage and Note. However, neither Trust, nor  Bank  of  America, N.A.   can  show  proper  receipt,  possession,  transfer,

---

[1]    http://www.sec.gov/Archives/edgar/data/1081915/000095011705004506/a40882.htm

negotiation, assignment, and/or ownership of Plaintiffs original Promissory Note and Mortgage, resulting in imperfect security interests and claims.

54. According to the PSA, Plaintiffs' note and Mortgage had to be indorsed and assigned, or transferred, respective, to the trust and executed by multiple intervening parties before it reached the Trust.

55. Plaintiffs are informed and believe, and thereon allege, that the Note and Mortgage executed by Plaintiffs in favor of the original lender and other Defendants was not properly assigned and/or transferred to Defendants in accordance with the PSA and/or New York trust law to the entities making and receiving the purported assignments to this trust.

56. In view of the foregoing, all Assignments of Mortgage executed after the Trust's Closing Date would be a void act for the reason that it violated the express terms of the Trust instrument.

57. More specifically, the Note and Mortgage, as the defendants allegedly and incorrectly claim, was assigned to the Securitized Trust by the  Feb. 27, 2006 closing date. Therefore, under the PSA, the purported assignments on or about  to the Trust were attempted subsequent to the specified closing date for the Trust as provided in the PSA and are therefore invalid and/or void; as they occurred approximately 5 years, respectively, from the specified closing date mandated by the PSA agreement.

58. Plaintiffs further allege that even if the Note and Mortgage had been transferred into the Trust by the closing date, the transaction is still invalid and/or void as the Note would not have been transferred according to the requirements of the

PSA, since the PSA requires a complete and unbroken chain of transfers/assignments to and from each intervening party.

59. While Trust claims that it is the "holder and owner" of the Note and the beneficiary of the Mortgage, there are no valid assignments of the foregoing documents to Trust.

60. Plaintiffs further alleges that no documents or records can be produced that demonstrate that prior to the closing date for Trust, the Note was duly indorsed, transferred and delivered to Trust, including all intervening transfers. Nor can any documents or records be produced that demonstrate that prior to the closing date, the Mortgage was duly assigned, transferred and delivered to the Trust, via the trustee, including all intervening transfers/assignments.

61. Based upon the foregoing, Plaintiffs is further informed and believes, and thereon alleges, that the following deficiencies exist, in the securitization process as to the Mortgage which renders invalid any security interest in the said mortgage, including, but not limited to:

a. The splitting or separation of title, ownership and interest in Plaintiffs' Note and Mortgage of which the original lender is the holder, owner and beneficiary of Plaintiffs' Mortgage;

b. Then the loan was sold to each intervening entity, there were no Assignments of the Mortgage to or from any intervening entity at the time of the sale;

c. The failure to assign and transfer the beneficial interest in Plaintiffs' Mortgage to Trust, in accordance with the PSA of the Defendants, as Securitization Participants;

d. The failure to indorse, assign and transfer Plaintiffs' Note and/or mortgage to Trust, in accordance with the PSA and applicable New York law and/or the Uniform Commercial Code;

e. No Assignments of Beneficiary or Indorsements of the Note to each of the intervening entities in the transaction ever occurred which is conclusive proof that no true sales occurred as required under the PSA; and

f. Defendants violated the pertinent terms of the PSA.

62. Plaintiffs, therefore, alleges, upon information and belief, that none of the parties to neither the securitization transaction, nor any of the Defendants in this case, hold a perfected and secured claim in the Property; and that all Defendants are estopped and precluded from asserting an unsecured claim against Plaintiffs' estate.

63. In addition, upon information and belief, before Defendants attempted to securitize the Loan, Plaintiffs Loan was "table funded" by the originator of the Loan using a warehouse line of credit.

64. The warehouse lender took Plaintiff's note and mortgage as collateral for the warehouse line of credit used by Countrywide Home Loans, Inc. to fund Plaintiffs loan. "A national bank may warrant the title to property it conveys, or become liable as an indorser or guarantor of notes or other obligations which it rediscounts or sells because to do so is incidental to the business it is authorized to transact, and to the disposition of property it has lawfully acquired. But it cannot lend its credit to another by becoming surety, indorser, or guarantor for him. It cannot for the accommodation of another indorse his note or guarantee the performance of obligations in which it has no interest. Such an act is an adventure beyond the confines of its charter, and,

when its true character is known, no rights grow out of it, though it has taken on in part the garb of a lawful transaction." This is akin to a preacher standing at a wedding alter with the groom and instead of the wife showing up for the wedding a substitute shows up.

65. At the time that the Trust claims it was the owner and holder of the note and mortgage, the note and mortgage were still being held by the table funder (warehouse line of credit lender) as collateral for its loan.

66. **The note and mortgage cannot be held and owned by two un-related entities at the same time**. Plaintiffs note and mortgage could not have been properly and legally assigned to the Trust at the time the Trust claims such assignment took place.

67. In addition, table funding of Plaintiffs loan required disclosure under RESPA. Defendants violated RESPA rules by failing to disclose the use of table funding for Plaintiffs loan, the source of funds used on Plaintiffs loan, and the commissions and fees earned by Countrywide Home Loans, Inc. and others relating to the use of the table funded loan.

## COUNT I
### (Violations of RESPA)

70.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

71.   RESPA generally prohibits the payment of "kickbacks" or "referral fees" to any person in connection with a federally related mortgage loan.

72.    The Plaintiffs loan was a federally related mortgage loans. The payment of the so-called "yield spread premiums" constituted a prohibited "kickback" or "referral fee," and violated RESPA even if the same were properly disclosed, which they were not.

73.    As a direct result of the Defendants' violations of RESPA, the Plaintiffs have suffered, and will continue to suffer, considerable damages.

74.    COUNTRYWIDE HOME LOANS, INC. and, subsequently, Wilmington Trust Company,  trustee, et al's acquisition of the subject loan was not a *bona fide* secondary market purchase, but rather was designed to give the impression of a secondary market purchase while operating as the functional equivalent of "table funding."   As such, Defendants are liable to the same extent as the named "lender" under RESPA. 12 U.S.C. § 2607(d)(2), which provides that the Plaintiffs may recover as civil damages three times the amount of the unlawful charges or payments as referenced above. In addition, 12 U.S.C. § 2607(d)(5) permits the Plaintiffs to recover their litigation costs and attorneys' fees occasioned by the Defendants' violations of RESPA.

## COUNT II
### (RESPA — Fee Splitting)

75.    Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

76.    12 U.S.C. § 2607(b) provides that "[n]o person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."

77.    COUNTRYWIDE HOME LOANS, INC. split charges between them and other Defendants and un-named brokers which were connected to transactions involving federally

related mortgage loans, including but not limited to the "yield spread premiums" described above.

78.     These "yield spread premiums" and other charges were not for settlement services — they were simply illegal "kickbacks." However, to the extent that any of the Defendants might be said to have rendered settlement services in exchange for the charges, the Defendants violated Section 2607(b) by splitting the charges with those Defendants (and possibly others) who did not render such services.

79.     As a direct result of the Defendants' violations of Section 2607(b), the Plaintiffs have suffered, and continue to suffer, considerable damages.

## COUNT III
### (Violations of TILA)

80.     Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

81.     Each of the transactions at issue in this case is a consumer credit transaction within the meaning of 15 U.S.C. §§ 1601 and 1635, and Reg. Z §§ 226.2 and 226.23.

82.     Bank of America,  is a creditor within the meaning of 15 U.S.C. §§ 1601 and 1635, and Reg. Z §§ 226.2 and 226.23. COUNTRYWIDE HOME LOANS, INC. and  Wilmington Trust Company , et al are liable for violations committed by the statutorily defined "creditor" under 15 U.S.C. § 1641(e) because the disclosures could be determined to be incomplete or inaccurate by a comparison among the disclosure statement and other documents surrounding the loan, and Countrywide's own records of the disbursement of the illegal and improper "kickbacks" or "referral fees" denominated as "yield spread premiums."  83.     The Plaintiffs loan are subject to the right of rescission as described by 15 U.S.C. §§ 1601 and 1635, and Reg. Z § 226.23.

84.   TILA and Reg. Z § 226.17 require the disclosure of payments made to third parties on the borrowers' behalf. In the mortgage loan context, TILA and Reg. Z allow the Good Faith Disclosures required by RESPA to substitute for the disclosures required under TILA.

85.   RESPA (and thus TILA) requires payments such as those made by COUNTRYWIDE HOME LOANS, INC. to others to be disclosed both on the borrowers' Good Faith Estimate within three calendar days of application, and on the borrowers' HUD-1 Settlement Statement.

86.   The Defendants violated TILA with respect to the Plaintiffs loan by, among other things, failing to properly disclose the "kickbacks" or "referral fees" paid to brokers and other Defendants..

87.   15 U.S.C. § 1640 entitles the Plaintiffs to statutory damages, costs, litigation expenses, and attorneys' fees as a consequence of the Defendants' violations of TILA.

88.   Moreover, as a result of these violations, the Plaintiffs right to rescind the loan transactions was extended for three years pursuant to 15 U.S.C. § 1635 and Reg. Z § 226.23.

89.   The Plaintiffs are entitled to rescind their loans if they so elect.  The existence of this right of rescission constitutes an actual controversy between the parties, which a declaratory ruling by this Court will assist in resolving. As such, the Plaintiffs are entitled to a declaratory ruling that they may exercise their right to rescission if they so elect.

## COUNT IV
### (Breach of Contract)

90.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

91.   Defendants expressly or impliedly promised the Plaintiffs that they would secure for them the mortgage loans available with an implied duty of good faith and fair dealing.

92.   Defendants failed to act in good faith and to act fairly when they inaccurately and intentionally completed the Federal Loan Application for the Plaintiffs. In fact, if the Plaintiffs earned over income was overstated on the Federal Loan Application, why would they qualify the Plaintiffs for a loan that the Plaintiffs could barely afford with their real and verifiable income . per month. In fact, by obtaining a stated income Loan for the Plaintiffs, Defendants Wilmington Trust Company . , et al and COUNTRYWIDE HOME LOANS, INC. created the impression that the loan could be easily affordable, when in reality the type of loan Defendants gave the Plaintiffs actually created a higher Yield Spread Premium for themselves.

93.   As a direct result of Wilmington Trust Company and COUNTRYWIDE HOME LOANS, INC. breach of contract, the Plaintiffs and the other class members have suffered, and will continue to suffer, considerable damages.

## COUNT V
### (Breach of Fiduciary Duty)

94.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

95.   Defendants were retained by the Plaintiffs as their agent to obtain for them the most affordable mortgage loan they could afford. In fact, if the Plaintiffs had indeed earned over more per month as stated on the Federal Loan Application, they could have easily qualified for a regularly amortizing loan altogether. As such, Defendants owed the Plaintiffs a fiduciary duty of the highest degree of loyalty, diligence and fidelity.

96.   This fiduciary duty included, among other things, the duty to complete the Federal Loan Application accurately, to disclose to the Plaintiffs and the other class members all material facts concerning the Plaintiffs' mortgage loan and settlement process, and to disclose all transactions whereby Plaintiff would itself benefit from the principal/agent relationship.

97.   Defendants, and its officers, directors and employees, specifically including Countrywide Home Loans, Inc. and Wilmington Trust Company, breached their fiduciary duties to the Plaintiffs by concealing, receiving and/or actually paying, the illegal and improper "kickbacks" and"referral fees" described above, as well as by failing to properly disclose other material facts as required by RESPA, CRESPA and TILA.

98.   When considering the totality of the circumstances, Defendants in fact obtained for the Plaintiffs a higher rate than was available from the lender simply so that Defendants could earn for itself higher "kickback" or "referral fees," at the expense of the Plaintiffs.

99.   As a direct result of these Defendants' breach of their fiduciary duties, the Plaintiffs have suffered, and will continue to suffer, considerable damages.

## COUNT VI
### (Common Law Fraud — Inducement)

100.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

101.   Defendants expressly or impliedly represented to the Plaintiffs that it would secure for them the most affordable loan available to them by accurately accounting for their monthly and yearly income.

102.   The requirements for Common Law Fraud are:

a.    a false statement of material fact ;

b.    the party making it knew or believe it to be untrue;

c.    the party to whom the statement was made had a right to rely on the statement;

d.    the party to whom the statement was made did rely on the statement;

e.    the statement was made for the purpose of inducing the other party to act; and,

f.    the reliance by the person to whom the statement was made led to that party's injury.

103.   Defendants Bank of America, N.A., and WILMINGTON TRUST COMPANYN.A. , ET AL meet each and every one of these common law fraud elements. Specifically, a) they made several false statements of material fact by failing to provide an accurate Good Faith Estimate, falsely completing the Federal Loan Application as to monthly salaries actually earned by the Plaintiffs, indicating that the Plaintiffs that they procured an affordable loan on the Plaintiffs' behalf, and indicating that Defendant was actually funding the loan (instead of table funding the loan); b) Bank of America, N.A., and Wilmington Trust Company, ET AL knew their assertions were NOT true; c) the Plaintiffs, as interested borrowers, had a right to rely on the statement; d) the Plaintiffs did rely on the statement; e) the Plaintiffs were induced to act on the false statements of material fact made by Defendants; and f) the Plaintiffs have been materially, substantially, and irrevocably injured by the misrepresentations of Defendants and BANK OF AMERICA, N.A.. By providing incentives for and regularly and knowingly accepting the "fruits of the fraud", Bank of America, N.A. and Wilmington Trust Company ET AL directly participated in the fraudulent scheme.

104. Further, Defendants created the false impression that Borrowers were given the most affordable loan for their circumstances, when in reality they obtained for the Plaintiffs loans that they could not ultimately afford. In fact, Defendants intended to obtain for the Plaintiffs a higher rate than was available from the lender simply so that Defendants could earn for itself a higher "kickback", "referral fee" or yield spread premium at the expense of the Plaintiff.

105. Defendants Bank of America, N.A., and WILMINGTON TRUST COMPANY., ET AL's representation that they had accurately and truthfully completed or supervised the completion of the Federal Loan Application was a material fact in that the Plaintiffs' would not have conducted themselves or gone through with the Transaction as they did, had they known of become aware of Defendants' obfuscations and true intentions. Defendants Bank of America, N.A., and WILMINGTON TRUST COMPANY, ET AL's misrepresentations as to their intentions materially induced the Plaintiffs and the other class members to enter into the mortgage loans obtained for them by Defendants, and the Plaintiffs and the other class members reasonably relied upon their false representations.

106. Defendants Bank of America, N.A., and WILMINGTON TRUST COMPANY., ET AL's directed, supervised, or directly or indirectly assented to the Plaintiff's fraudulent inducement.

107. As a direct result of these Defendants' fraudulent inducement, the Plaintiffs and the other class members suffered, and will continue to suffer, considerable damages.

## COUNT VII
### (Common Law Fraud — Concealment)

108.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

109.   Pursuant to RESPA, TILA, and the common law, the Defendants had a duty to properly disclose to the Plaintiffs that they had entered into an agreement whereby illegal and improper "kickbacks" or "referral fees" were to be paid and split between  Bank of America, N.A. and Wilmington Trust Company, et al , as well as a duty to properly disclose the other material facts set forth above and required to be disclosed by RESPA and TILA, including the fact that the Plaintiffs loan was table funded through a warehouse line of credit and that an entity other than COUNTRYWIDE HOME LOANS, INC. and WILMINGTON TRUST COMPANY , ET AL would hold title to the Plaintiffs note and mortgage as collateral during a period of time following the closing. The Defendants' agreement to pay, the actual payment of these fees, and the other facts set forth above, were material facts.

110.   The Defendants failed and/or refused to properly disclose these material facts to the Plaintiffs in spite of, and in violation of, their statutory and common law duties to do so.

111.   The concealment and obfuscation of the agreement, the table funding nature of the closing transaction, the actual payment of these fees not disclosed to Plaintiffs and the other material facts was undertaken by the Defendants to deceive the Plaintiffs, and to keep them from "asking questions" concerning the rates at which the money was lent to them, in order to maximize the Defendants' benefit from the transactions. The Defendants' actions were therefore taken with actual malice.

112.   The Plaintiffs reasonably relied upon the concealment by following through with the transactions, and not questioning the same.

113.   As a direct result of the Defendants' fraudulent concealment, the Plaintiffs have suffered considerable damages.

## COUNT VIII
### (Constructive Fraud)

114.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

115.   The Defendants were under statutory and common law duties, including fiduciary duties, whereby they were required to properly disclose to the Defendants, among other things, payments made to persons or entities attributable to the Plaintiffs loans, the table funding nature of the closing transaction, and the other material facts set forth above.

116.   The Defendants breached this duty by failing to properly disclose the agreement to pay and/or receive illegal and improper "kickbacks," "referral fees," and yield spread premiums by failing to properly disclose the actual payment and/or receipt of such fees, and by failing to properly disclose the other material facts set forth above.

117.   As a direct result of the Defendants' constructive fraud, the Plaintiffs suffered, and will continue to suffer, considerable damages.

## COUNT IX
### (Conspiracy)

118.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action. 286.   The Defendants agreed amongst themselves to take the illegal and improper actions described above, including taking actions that violated RESPA, TILA, and various common law duties, to reach the goal of maximizing their financial benefit from the loan transactions at the expense of the Plaintiffs.

119.   The Defendants' actions were undertaken with actual malice in that they were motivated by a desire to deceive the Plaintiffs.

120.   As a result of the Defendants' conspiracy, the Plaintiffs suffered, and will continue to suffer, considerable damages.

## COUNT X
## QUIET TITLE

121.   Plaintiffs reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

122.   At all times herein, Defendants committed acts of misrepresentations and fraud as to the terms of the loan, mortgage, and value of the property with the intent to exert undue influence.

123.   Plaintiff were under unfair persuasion amounting to undue influence because Defendants positioned themselves in the market where the Plaintiff was justified in assuming that the Defendants would not act in a manner inconsistent with Plaintiffs welfare and best interests.

124.   At all time herein, Defendants gained unfair persuasion and undue influence by improper means including but not limited to misrepresentations, undue flattery, and fraud.

125.   Defendants by fraud received an iniquitous deed of trust to secure debt to the property for a loan that Plaintiffs should not have given or been allowed to take. This loan would not have taken place but for Defendants' wrongful conduct.

126.   Defendants have created an illegal cloud on title. Plaintiffs have suffered severe financial hardship as a result. Plaintiffs request that the Court invalidate the deed of trust on the property.

## COUNT XI
## DECLARATORY RELIEF

127. Plaintiffs re-allege and incorporate by reference all preceding paragraphs as though fully set forth herein.

128. An actual controversy has arisen and now exists between Plaintiffs and Defendants regarding their respective rights and duties, in that Plaintiffs contends that Defendants, and each of them, do/did not have a valid secured interest in the Property sufficient to foreclose against the Property because Defendants, and each of them, have failed to perfect any security interest in the Property, and/or cannot prove that they have a valid interest in the Property (as a real party in interest) to foreclose. Thus, the purported power of sale, or power to foreclose judicially, by the Defendants, and each of them, no longer applies.

129. Plaintiffs further contend that the Defendants, and each of them, do not have the right to foreclose on the Property because said Defendants, and each of them, did not properly comply with the terms of Defendants' own securitization requirements (contained in the PSA) and falsify or fraudulently prepared documents required for Defendants, and each of them, to foreclose as a calculated and fraudulent business practice.

130. Plaintiffs further contends that the Defendants, and each of them, do not have the right to foreclose on the Property because the note and mortgage were held as collateral by the warehouse lender at the time Defendants assert that the note and mortgage were assigned to the Trust. The foregoing actions occurred before the fraudulent securitization of the note and mortgager.

131. Plaintiffs further contend that the Defendants, and each of them, do not have any right to foreclose on the Property, and do not have a legally enforceable security interest in the Property, as a result of the breach of UCC §3-305, in that the Defendants fraudulently induced

the Plaintiffs to sign the note and mortgage with neither knowledge nor reasonable opportunity for Plaintiffs to learn of their character or their essential terms as described hereinabove, including the fact that the original lender was none of the Defendants but rather was a table funder using a warehouse line of credit to fund the Plaintiffs closing, and the fact that the table funder took the note and mortgage as collateral immediately after the closing transaction.

132. Plaintiffs further contend that the Defendants, and each of them, do not have any right to foreclose on the Property, and do not have a legally enforceable security interest in the Property as a result of Defendants violation of New York General Business Law §349. The Defendants actions described hereinabove, and particularly in Paragraphs 128-131 above, constitute unlawful deceptive practices and estop the Defendants from asserting any rights or claims to the Property and further estop the Defendants from asserting any right to foreclose against the Property.

133. Plaintiffs requests that this Court find that the purported power of sale contained in the Note and Mortgage has no force and effect at this time, because Defendants' actions in the processing, handling and attempted foreclosure of this loan involved numerous fraudulent, false, deceptive and misleading practices, including, but not limited to, violations of State laws designed to protect borrowers, which has directly caused Plaintiffs to be at an equitable disadvantage to Defendants.

134. Alternatively, Plaintiffs requests that this Court find that Defendants had/have no right to foreclosure against the Property.


## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully request for the following:

**AS TO COUNT I – VIOLATIONS OF RESPA**

      a.   Award Damages in an amount to be determined by proof at trial;

      b.   Award Statutory damages as provided by law;

      c.   Award costs, interest, and attorney's fees.

**AS TO COUNT II – RESPA – FEE SPLITTING**

      d.   Award Damages in an amount to be determined by proof at trial;

      e.   Award Statutory damages as provided by law;

      f.   Award costs, interest, and attorney's fees.

**AS TO COUNT III – VIOLATIONS OF TILA**

      g.   Award Damages in an amount to be determined by proof at trial;

      h.   Award Statutory damages as provided by law;

      i.   Award costs, interest, and attorney's fees.

**AS TO COUNT IV – BREACH OF CONTRACT**

      j.   Award Damages in an amount to be determined by proof at trial;

      k.   Award costs, interest, and attorney's fees.

**AS TO COUNT V – BREACH OF FIDUCIARY DUTY**

      l.   Award Damages in an amount to be determined by proof at trial;

      m.   Award Punitive Damages as allowed by law;

      n.   Award costs, interest, and attorney's fees.

**AS TO COUNT VI – COMMON LAW FRAUD – INDUCEMENT**

      o.   Award Damages in an amount to be determined by proof at trial;

      p.   Award Punitive Damages as allowed by law;

      q.   Award costs, interest, and attorney's fees.

## AS TO COUNT VII – COMMON LAW FRAUD – CONCEALMENT

  r. Award Damages in an amount to be determined by proof at trial;

  s. Award Punitive Damages as allowed by law;

  t. Award costs, interest, and attorney's fees.

## AS TO COUNT VIII – CONSTRUCTIVE FRAUD

  u. Award Damages in an amount to be determined by proof at trial;

  v. Award Punitive Damages as allowed by law;

  w. Award costs, interest, and attorney's fees.

## AS TO COUNT IX – CONSPIRACY

  x. Award Damages in an amount to be determined by proof at trial;

  y. Award Punitive Damages as allowed by law;

  z. Award costs, interest, and attorney's fees.

## AS TO COUNT X – QUIET TITLE

  aa. Award Plaintiffs exclusive possession of the Property;

  bb. Determine that Defendants, and all persons claiming under them, have no estate, right, title, lien, or interest in or to the Property;

  cc. Award Damages in an amount to be determined by proof at trial;

  dd. Award Punitive Damages as allowed by law;

  ee. Award costs, interest, and attorney's fees.

## AS TO COUNT XI – DECLARATORY RELIEF

  ff. Declare that the Trust does not have an enforceable secured or unsecured claim against the Property;

gg. Declare that Defendants do not have an enforceable secured or unsecured claim against the Property;

hh. Declare that the Plaintiffs own the Property free and clear of all encumbrances of the Defendants or anyone claiming by or through the Defendant;

ii. Award Damages in an amount to be determined by proof at trial;

jj. Award costs, interest, and attorney's fees.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, plaintiffs demand a trial by jury for issues so triable.

Dated:        May 14, 2016

Respectfully Submitted,

---

### VERIFICATION

### VERIFICATION

The undersigned,, hereby says:

That deponent is Plaintiff within action; that deponent has read the foregoing and knows the contents thereof, that the same is true to the deponent's own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to these matters, deponent believes them to be true. Deponent further says that the reason this verification is made

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, plaintiff demands a trial by jury for issues so triable.

Dated:    June 29, 2016

Respectfully Submitted,

Tatiana Dins

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness accuracy, or validity of that document.

State of California, County of _SAN  MATEO_
Subscribed & sworn to (or affirmed) before me
on this _19_ day of _JULY_, 20_16_,
by _TATIANA  DINS_,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Signature _____ (Seal)

SHASHI SHETH
Commission # 2047796
Notary Public - California
San Mateo County
My Comm. Expires Nov 30, 2017

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, plaintiff demands a trial by jury for issues so triable.

Dated:    June 8, 2016

Respectfully Submitted,

Tatiana Dins

See attached California
Acknowledgement, Date
06.08.2016

## CERTIFICATE OF SERVICE

I certify that a copy of the Summons and Complaint will be served upon defendants listed below in compliance with Fed. R. Civ. P. Rule 4:

Wilmington Trust Company

1100 North Market Street

Wilmington, Delaware 19890-001

Bank of America

111 8th Ave.

New York, NY 10011

Dated: June 29, 2016

Tatiana Dins

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness accuracy, or validity of that document.

SHASHI SHETH
Commission # 2047796
Notary Public - California
San Mateo County
My Comm. Expires Nov 30, 2017

State of California, County of _SAN MATEO_
Subscribed & sworn to (or affirmed) before me
on this _1st_ day of _JULY_, 20_16_,
by _TATIANA DINS_,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Signature _____ (Seal)

## VERIFICATION

The undersigned, hereby says:

That deponent the plaintiff in the within action; that deponent has read the foregoing and knows the contents thereof, that the same is true to the deponent's own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to these matters, deponent believes them to be true. Deponent further says that the reason this verification is made by deponent and not by the plaintiff is that the plaintiff resides in a county other than that in which deponent maintains their offices.

The undersigned affirms that the foregoing statements are true.


Dated:          June 29, 2016

_____

Tatiana Dins


> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness accuracy, or validity of that document.


State of California, County of ___SAN MAX o___
Subscribed & sworn to (or affirmed) before me
on this __18__ day of __JULY__, 20_16_,
by __TATIANA    DINS__
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Signature _____(Seal)

SHASHI SHETH
Commission # 2047796
Notary Public - California
San Mateo County
My Comm. Expires Nov 30, 2017

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of  San Mateo                    )

On  JUNE 8, 2016  before me,  Rory Thomas Brennan, Notary Public,

(insert name and title of the officer)

personally appeared  TATIANA DINS

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



**RORY THOMAS BRENNAN**
COMM. #2029228
NOTARY PUBLIC • CALIFORNIA
SAN MATEO COUNTY
My commission expires June 16, 2017

Signature  RORY BRENNAN      (Seal)



## VERIFICATION

The undersigned, hereby says:

That deponent the plaintiff in the within action; that deponent has read the foregoing and knows the contents thereof, that the same is true to the deponent's own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to these matters, deponent believes them to be true. Deponent further says that the reason this verification is made by deponent and not by the plaintiff is that the plaintiff resides in a county other than that in which deponent maintains their offices.

The undersigned affirms that the foregoing statements are true.


Dated:        June 8, 2016


_____
Tatiana Dins, Pro



See attached California
Acknowledgement, Date
06-08-2016

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _San Mateo_ )

On _JUNE 8, 2016_ before me, Rory Thomas Brennan, Notary Public,

(insert name and title of the officer)

personally appeared _TATIANA DINS_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



RORY THOMAS BRENNAN
COMM. #2029228
NOTARY PUBLIC • CALIFORNIA
SAN MATEO COUNTY
My commission expires June 16, 2017

Signature _Rory Brennan_ (Seal)



## CERTIFICATE OF SERVICE

I certify that a copy of the Summons and Complaint will be served upon defendants listed below in compliance with Fed. R. Civ. P. Rule 4:

Wilmington Trust Company

1100 North Market Street

Wilmington, Delaware 19890-001

Bank of America

111 8th Ave.

New York, NY 10011

Dated: June 8, 2016

_____

Tatiana Dins

See attached California
Acknowledgement page
06.06.2016

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of San Mateo )

On JUNE 8, 2016 before me, Rory Thomas Brennan, Notary Public,

(insert name and title of the officer)

personally appeared TATIANA DINS

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



RORY THOMAS BRENNAN
COMM. #2029228
NOTARY PUBLIC • CALIFORNIA
SAN MATEO COUNTY
My commission expires June 16, 2017

Signature Rory Brennan (Seal)



# Affidavit of Tatiana Dins

1. **I, Plaintiff Tatiana Dins,** hereby declare:  I solemnly affirm that the following is true, correct, and complete to the best of my own personal knowledge and understanding.  I am over the age of eighteen years.  If called as a witness, I will competently testify under oath to the truth of the facts stated herein.  I am a Plaintiff in this action.  This declaration supports my Complaint.
2. I reside at 2709 Jackson Street, San Francisco, California 94115 and my mailing address is 1592 Union Street, Unit 90, San Francisco, California 94123
3. On January 24, 2006, Country Wide Home Loans, Inc., had Tatiana Dins and mother, Serafima Rovinskaya sign a Note and Deed of Trust for $1,000,000.00 - Loan # 12209842.
4. On January 24, 2006, Country Wide Home Loans, Inc., hounded my mother, Serafima Rovinskaya and I, Tatiana Dins with very aggressive sales tactics to purchase a "HELOC" Home Equity Line of Credit. in the amount of $1,000,000.
5. Equity Line of Credit (HELOC) $1,000,000.00 with loan number 12209842.
6. Bank of America acquired Countrywide about January 11, 2008.
7. On December 24,2012 received a letter that read" **NOTICE OF INTENT TO ACCELERATE AND FORECLOSE"** The amount showing was $16,752.36.
8. On 1/11/2013 Received letter from BOA stating that they have not been able to contact me or my mother and that they were going to send a field representative from Titanium Solutions to contact directly.
9. On 1/11/2013, I Looked them up and they conducted some unlawful things to homeowners. I found out that they shut down their operations in the first part of 2013.
10. Again on January 11, 2013, I received letter from BOA that was worded differently but stating that they have not been able to contact me or my mother and that they were going to send a field representative from Titanium Solutions to contact directly.
11. On January 18, 2013 received a letter from BOA stating that that payment is in default and will be using companies such as LandSafe Services, LLC., to collect debt.
12. On February 5, 2013 received letter from BOA about my letter I sent them concerning the validation of debt. They stated that they are in the process of obtaining the documentation necessary to address my questions concerning the debt.
13. On February 7, 2013, They also mentioned their response, which was no response by sworn affidavit stating their position and reasons for not making those documents available.
14. On March 13, 2013, I sent BOA a **"Qualified Written Request"** which is part of the **Real Estate Settlement Procedures Act, 12 U.S.C.** This was sent because I request to see the original certified documents such as the promissory note. They never sent the original certified copy of the front and back of the note that I and my mother originally signed.
15. On March 29, 2013 received letter from BOA concerning the **Qualified Written Request** they received from me on March 13, 2013. It concerned the **QWR** with emphasis on the certified promissory note and the missing forms such as the **3 day rescission form** that my mother and I never received at signing.
16. On May 7, 2013, I sent another "Qualified Written Request" It was titled, **"QUALIFIED WRITTEN REQUEST, COMPLAINT, DISPUTE OF DEBT AND VALIDATION OF DEBT LETTER, TILA REQUEST.** Once again, I request certified documents and sworn affidavits instead of copies.
17. On May 14, 2013 received letter from BOA acknowledging receipt of my recent inquiry of loan in question, loan number 12209842. There was no real solution to my requests.

18. On May 17, 2013 received letter from BOA concerning a correspondence they received from me on March 7 2013 stating that they can't answer certain questions in the **QWR.** However, never stating what questions they cannot answer concerning loan in question # 12209842. The letter mentioned that the loan in question was recorded through Mortgage Electronic Registration System (MERS). It stated that no escrow account was set up at time of loan origination and no lender placed insurance been purchased in association with this loan.

19. May 17, 2013 received letter from BOA thanking me for my recent inquiry regarding the investor, or owner of this loan. That they are authorized by the investor of this loan. The investor according to BOA letter is BOA.

20. On May 21, 2013 received letter stated that they are in receipt of my letter dated May 3, 2013 rescinding the loan. They stated that the 3 years expired. However, if fraud is evident, the 3 years is extended. My mother and I have not received our 3 (three) day notice of the right to cancel. That is a requirement.

21. On May 24, 2013 received letter from BOA stating that the property will be referred to foreclosure. It stated the principle obligation of $886, 162.63.

22. On July 13, 2013 sent an "Affidavit of Tatiana Dins" It was a dishonor of commercial instrument - **UCCX3 – 603 NOTICE TO CEASE AND DESIST.** It stated that I forward a commercial instrument (31 USC 3123, 5103 and 5118) directing settlement and account closure of account 122090842 in the amount of $894, 069.00.

23. Because BOA failed to provide proof that the instrument was not lawful tender and accepted. When ask to return instrument, BOA kept it. It is trading. You can look it up on treasury direct

24. On July 18, 2013 I received a letter from BOA stating that as a result of my failure to make timely payments this alleged account has been charged off in the amount of $886,444.50. But at the same time telling me that the balance noted if due in full.

25. On October 9, 2013 received a letter from BOA to collect $896,216.09.

26. On October 29, 2013 I replied to BOA letter dated October 9, 2013 with the title, **"FAIR DEBT COLLECTIONS PRACTICES ACT; NOTICE OF DISPUTE OF DEBT and DEMAND FOR VERIFIED DOCUMENTATION.** I asked for personal verification or someone with personal knowledge of the requested certified documents such as the promissory note and original signed contract with both of our signatures for visual viewing. I also asked for sworn affidavits.

27. On November 19, 2013 I sent a fax to **Judith McManus** of BOA asking them to provide documentation via sworn written affidavit everything concerning the promissory Note and deed of Trust. They did not respond with a sworn affidavit. They just sent meaningless, generic paperwork.

28. Also on November 19, 2013 I sent to Judith McManus, account administrator a **Good Faith Discovery Notice** titled, **"Verification of Proof of Claim requested".** That I wanted to inspect the original document my mother and I signed.

29. On November 19, 2013 I sent Bruce R. Thompson, CFO, a **Good Faith Discovery Notice** titled, **"Verification of Proof of Claim** requested". That I Wanted to inspect the original document my mother and I signed.

30. On November 21, 2013 BOA sent me a collection letter to collect $900,256.27. **Still stating that the account has been charged off.**

31. On December 9, 2013, I received letter from BOA acknowledging receipt of my recent inquiry of loan in question, loan number 12209842. Stating that they are in the process of concluding their review to provide a response.

32. On December 17, 2013 received letter from **Miles, Bauer, Bergstrom & Winters, LLP** stating that they are representing Bank of America to collect alleged debt of $900, 820.01 threatening to file suit.

33. On December 20, 2013 received letter from BOA stated that they are in receipt of my letter dated November 19, 2013 **Good Faith Discovery Notice titled, "Verification of Proof of Claim** I requested that they rescind the loan. They responded again and rejected the rescinding of the loan and stating that the 3 years expired. However, if fraud is evident, the 3 years is extended. My mother and I have not received our 3day notice of the right to cancel. To this day, they have not even provided a copy of the requested document. According to Real Estate law, that is a requirement.

34. On **January 16, 2014**, by certified mail, I sent the debt collector, the law firm Miles Bauer, Berstrom & Winters, LLP, a **Proof of Claim of Debt Validation** (showing them a letter from Bank of America, that it was charged off). On **January 16, 2014**, I sent to the law firm, Miles Bauer, Berstrom & Winters, LLP, a confidential fax asking to produce all documents that evidence, relate to or refer to the date they obtained physical possession or had personal knowledge of Tatiana Dins Promissory note.

35. On **January 29, 2014,** I received a response package from, the law firm, Miles Bauer, Berstrom & Winters, LLP to my Fax dated January 16, 2014, regards to Original Creditor: Bank of America.

36. n **March 11, 2014,** I sent to the law firm Miles Bauer, Berstrom & Winters, LLP, a § 9-210 , REQUEST FOR ACCOUNTING; REQUEST REGARDING LIST OF COLLATERAL OR STATEMENT OF ACCOUNT for Loan Account #122090842.

37. On **April 7, 2014,** I sent to, the law firm Miles Bauer, Berstrom & Winters, LLP, a notice asking **Verification of Proof of Claim Requested.**

38. **On April 29, 2015,** I received a letter from the law firm **Miles Bauer, Berstrom & Winters, LLP** *stating they are no longer serving as the collection agent for Bank of America.*

39. On **June 23, 2015,** I received a response to my recent home loan inquiry from BOA stating they are in the process of concluding their review to provide me with a response.

40. On **June 29, 2015,** I received a reply to my inquiries **Bank of America** regarding my loan, ***stating they've concluded that the property was involved in a charge off.*** As a result, the home loan account is no longer active in their system.

41. On **October 1, 2015,** I mailed documents to Bank of America, Simi Valley, California to request a physical inspection of my wet ink signature of the original promissory note that I, requested regarding a statement of account pursuant to the uniform commercial code.

42. On **October 1, 2015,** I sent by certified mail, the modification deed of trust, the substitution of trustee notice, the revocation of power of attorney, notary acknowledgment.

43. On **October 25, 2015,** I mailed a Certification of Non-Response / Non-Performance to Bank of America, Simi Valley, CA, to paperwork I mailed on October 1, 2015.

44. On November 23, 2015, Bank of America force me to spend money to get an **Audit performed** and get proper legal advice to fight for what I believe that got paid multiple times. I am an American Citizen and try to do the right thing every day of my life.

45. On June 3, 2016, I mailed out and information request (**Form UCC11**) to gather information on the security.

46. On June 3, 2016, I mailed out the (**Form 3949-A**) Department of the Treasury - Internal Revenue Service Information Referral, to file complaint against the Bank for False Exemption, False Deductions, Multiple Filings that may lead to Organized Crime, Unsubstantiated Income Earned Income from trading multiple times. And possible False/Altered Documents, Unreported Income, and possible Failure to File Return or Failure to Pay the required Tax)

47. On June 3, 2016, I mailed out the (**Form 211**) Application for Award for Original Information.

48. On June 3, 2016, I mailed out the (**Form TCR TIP, COMPLAINT OR REFERRAL**) to file a complaint against the Bank for False Exemption, False Deductions, Multiple Filings that may lead to Organized Crime, Unsubstantiated Income Earned Income from trading multiple times. And possible

False/Altered Documents, Unreported Income, and possible Failure to File Return or Failure to Pay the required Tax)

49. This has caused a lot of emotional hardship on trying to do the right thing and take care of this matter with Bank of America

50. I declare under penalty of perjury that this entire declaration is true and correct, except for those items specifically stated upon information and belief, and as to those items, I believe them to be true.  This declaration was executed at San Francisco, California on June 3, 2016

_____
Tatiana Dins

# ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California            )

County of San Francisco       )

On _06_/_03_/_2017_ 2016 AD before me, _ALLEN BEARD_____

Notary Public personally appeared _TATIANA DINS_____,
who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity and that by her signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____                              [SEAL]
            Notary Public

ALLEN BEARD
COMM. #2017884
Notary Public · California
San Francisco County
Comm. Expires Apr 6, 2017

Commission expires _04_/_06_/_2017_____, 20___



**Certified Forensic Loan Auditors**

# *CERTIFIED FORENSIC LOAN AUDITORS, LLC*

13101 West Washington Blvd., Suite 140, Los Angeles, CA 90066
Phone:  310-432-6304; Sales@CertifiedForensicLoanAuditors.com
www.CertifiedForensicLoanAuditors.com

# *PROPERTY*
# *SECURITIZATION ANALYSIS REPORT*™

### *Prepared for:*

### *TATIANA DINS and SERAFIMA ROVINSKAYA*

### *For Property Address*

### *2709 Jackson Street*
### *San Francisco, CA 94115*

### *Prepared on:*

### *November 23, 2015*

Disclosure: You have engaged Certified Forensic Loan Auditors, LLC to examine your real estate documents.  This information is not to be construed as legal advice or the practice of law, pursuant to *Business and Professions Code § 6125 et seq,* it is the intent of CFLA, its members, auditors and independent contractors, not to engage in activities that could be considered the practice of law by conduct exhibiting any of the following practices: "*...the doing and/or performing of services in a court of justice in any matter depending therein throughout the various stages and in conformity with the adopted rules of procedure. It includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be depending in a court.*"

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

# SECTION 1:    TRANSACTION DETAILS

## BORROWER & CO-BORROWER:

| BORROWER | CO-BORROWER |
|---|---|
| Tatiana Dins | Serafima Rovinskaya |
| **CURRENT ADDRESS** | **SUBJECT ADDRESS** |
| 2709 Jackson Street<br>San Francisco, CA 94115 | 2709 Jackson Street<br>San Francisco, CA 94115 |

## TRANSACTION PARTICIPANTS

| AMOUNT | MORTGAGE SERVICER | MORTGAGE NOMINEE/BENEFICIARY |
|---|---|---|
| $1,000,000.00 | Bank of America, N.A.<br>Simi Valley, CA | Mortgage Electronic Registration Systems, Inc. ("MERS")<br>PO Box 2026<br>Flint, MI 48501-2026<br>(888)679-MERS |
| **ORIGINAL MORTGAGE LENDER** | **MORTGAGE TRUSTEE** | **TITLE COMPANY** |
| Countrywide Home Loans, Inc.<br>4500 Park Granada<br>Calabasas, CA 91302 | CTC Real Estate Services<br>400 Countrywide Way<br>Simi Valley, CA 93065 | To be determined<br><br>Documents Returned To:<br>Countrywide Home Loans, Inc.<br>Document Processing<br>P.O. Box 10423<br>Van Nuys CA 91410 |

Page | 2

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*<br>*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

# SECTION 2:    SECURITIZATION

## SECURITIZATION PARTICIPANTS:

| ORIGINATOR/LENDER | SPONSOR/SELLER | DEPOSITOR |
|---|---|---|
| COUNTRYWIDE HOME LOANS, INC. | COUNTRYWIDE HOME LOANS, INC. | CWHEQ, INC. |
| **ISSUING ENTITY** | **TRUSTEES** | **MASTER SERVICER/ SERVICER** |
| CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2006-A | JPMORGAN CHASE BANK, N.A. (Indenture Trustee) CHASE BANK, N.A. (Co-Trustee) WILMINGTON TRUST COMPANY (Owner Trustee) | COUNTRYWIDE HOME LOANS, INC. |
| **CUSTODIAN** | **CUT – OFF DATE** | **CLOSING DATE** |
| TREASURY BANK, a Division of COUNTRYWIDE BANK, N.A. | February 22, 2006 | February 27, 2006 |

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## PROSPECTUS SUPPLEMENT

424B5 1 d424b5.htm CWHEQ 2006-A

**Prospectus Supplement**
**(To Prospectus dated February 7, 2006)**

# $800,000,000
### (Approximate)

## CWHEQ Revolving Home Equity Loan Trust,
### Series 2006-A
#### Issuing Entity

# Revolving Home Equity Loan Asset Backed Notes, Series 2006-A
## CWHEQ, Inc.
#### Depositor



### HOME LOANS
#### Sponsor, Seller, and Master Servicer

-----------------------------------------------------

## Countrywide Securities Corporation
### February 24, 2006

**http://www.sec.gov/Archives/edgar/data/1310402/000119312506041387/d424b5.htm**

Page | 4

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

# SUMMARY OF TRANSACTION AND TRANSACTION PARTIES

## Summary

**This summary highlights selected information from this prospectus supplement and does not contain all of the information that you need to consider in making your investment decision. To understand all of the terms of an offering of the notes, read carefully this entire prospectus supplement and the accompanying prospectus.**

**While this summary contains an overview of certain calculations, cash flow priorities, and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities, and other information in this prospectus supplement and the accompanying prospectus before making any investment decision.**

### Issuing Entity

The issuing entity will be CWHEQ Revolving Home Equity Loan Trust, Series 2006-A, a Delaware statutory trust. *See "The Issuing Entity."*

### Depositor

CWHEQ, Inc., a limited purpose finance subsidiary of Countrywide Financial Corporation. Its address is 4500 Park Granada, Calabasas, California 91302, and its telephone number is (818) 225-3000 (818) 225-3000 . *See "The Depositor" in the prospectus.*

### Sponsor and Master Servicer

Countrywide Home Loans, Inc., a New York corporation and a subsidiary of Countrywide Financial Corporation. *See "The Sponsor and Master Servicer."*

### Sellers

Countrywide Home Loans, Inc. will be the seller of a portion of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation, which, in turn, acquired those mortgage loans directly from Countrywide Home Loans, Inc.

### Indenture Trustee

JPMorgan Chase Bank, National Association, a national banking association.

### Co-Trustee

Chase Bank USA, National Association, a national banking association and an affiliate of JPMorgan Chase Bank, National Association.

### Custodian

Treasury Bank, a division of Countrywide Bank, N.A. (formerly Treasury Bank, National Association), a national banking association and an affiliate of the sponsor and the master servicer.

Page | 5

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

**Owner Trustee**

Wilmington Trust Company, a Delaware banking corporation.

**Loan Insurer**

United Guaranty Residential Insurance Company of North Carolina will provide a second mortgage bulk insurance policy that provides coverage if a borrower defaults on a covered mortgage loan as described in this prospectus supplement. Only a portion of the mortgage loans will be covered by the second mortgage bulk insurance policy.
*See "The Loan Insurer."*

**Trust Fund**

The trust fund will consist of an initial pool of home equity revolving credit line loans made or to be made in the future under certain home equity revolving credit line loan agreements and funds that may be deposited into the additional loan account on the closing date to be used to acquire additional home equity loans that are not included in the initial cut-off date pool. The initial loans and the additional home equity loans will be secured by second deeds of trust or mortgages on primarily one- to four-family residential properties and will bear interest at rates that adjust based on the prime rate. We sometimes refer to these loans as home equity loans or mortgage loans. On the closing date, the aggregate principal

Page S-3

balance of all classes of LIBOR notes will equal the sum of the aggregate initial cut-off date principal balance of the home equity loans in the mortgage pool transferred to the issuing entity on the closing date and any funds deposited into the additional loan account on the closing date.

At the end of the funding period for additional home equity loans, the loan pool will consist of mortgage loans expected to have an aggregate principal balance of approximately $800 million as of their cut-off dates.

**Indenture**

The notes will be issued pursuant to an indenture among the issuing entity, the indenture trustee, and the co-trustee.

**Initial Cut-off Date**

For any initial mortgage loan, the later of February 22, 2006, and the date of origination of the mortgage loan.

**Subsequent Cut-off Date**

For any additional home equity loan, the subsequent cut-off date that will be specified for that loan in the transfer document.

**Closing Date**

February 27, 2006.

Page | 6

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

## The Mortgage Loans

*General*

The mortgage loans are revolving lines of credit. During the applicable draw period, each borrower may borrow additional amounts from time to time up to the maximum amount of that borrower's line of credit. If borrowed amounts are repaid, they may be re-borrowed during the applicable draw period.

The loan pool balance equals the aggregate of the principal balances of all the mortgage loans. The principal balance of a mortgage loan (other than a liquidated mortgage loan) on any day is equal to

- its cut-off date principal balance,
  *plus*

- any additional borrowings on that mortgage loan,
  *minus*

- all collections credited against the principal balance of that mortgage loan before that day.

Once a mortgage loan is finally liquidated, its principal balance is zero.


## ASSIGNMENT OF MORTGAGE LOANS

### Assignment of Mortgage Loans

At the time of issuance of the Notes, the depositor will transfer to the issuing entity, the amounts to be deposited into the Additional Loan Account, if any, and all of its interest in each mortgage loan acquired on the closing date (including any Additional Balances arising in the future), related credit line agreements, mortgages, and certain other related documents (collectively, the "***Related Documents***"), including all collections received on each mortgage loan after the initial cut-off date (exclusive of payments of accrued interest due on or before the initial cut-off date). The indenture trustee, concurrently with the transfer, will deliver the Notes to the depositor and the Transferor Interest and the Class R-1 Certificates to its respective owner. Subsequent closings may occur for the purchase of Additional Home Equity Loans on dates specified by the depositor during the Funding Period. On those

Page S-73

closing dates the depositor will transfer to the issuing entity all of its interest in the Additional Home Equity Loans being acquired by the issuing entity that day (including any Additional Balances arising in the future), the Related Documents, and all collections received on the Additional Home Equity Loans after the subsequent cut-off date. Each mortgage loan transferred to the issuing entity will be identified on a mortgage loan schedule delivered to the indenture trustee pursuant to the sale and servicing agreement. The mortgage loan schedule will include information as to the principal balance of each mortgage loan as of the initial cut-off date or subsequent cut-off date, as applicable, as well as information with respect to the loan rate.

The sale and servicing agreement will require that Countrywide deliver to the depositor for delivery to the issuing entity, and the issuing entity will deliver to the custodian, the mortgage notes related to the mortgage loans endorsed in

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

blank and the Related Documents

- on the closing date, with respect to not less than 50% of the initial mortgage loans transferred to the issuing entity on the closing date;

- not later than the twentieth day after the closing date, with respect to not less than an additional 40% of the initial mortgage loans transferred to the issuing entity on the closing date; and

- not later than 30 days after the closing date, with respect to the remaining initial mortgage loans transferred to the issuing entity on the closing date.

- on any subsequent transfer date, with respect to not less than 10% of the Additional Home Equity Loans transferred to the issuing entity on that subsequent transfer date; and

- not later than the twentieth day after any subsequent transfer date, with respect to the remaining Additional Home Equity Loans transferred to the issuing entity on that subsequent transfer date.

In lieu of delivery of original documentation, Countrywide may deliver documents that have been imaged optically on delivery of an opinion of counsel that the imaged documents are enforceable to the same extent as the originals and do not impair the enforceability of the transfer to the issuing entity of the mortgage loans, provided the retention of the imaged documents in the delivered format will not result in a reduction in the then current rating of the Notes.

In addition, with respect to any of the mortgage loans, in lieu of transferring the related mortgage to the indenture trustee as one of the Related Documents, the depositor may at its discretion provide evidence that the related mortgage is held through the MERS* System. In addition, the mortgage for some or all of the mortgage loans in the trust fund that are not already held in the MERS* System may, at the discretion of the master servicer, in the future be held through the MERS* System. For any mortgage held through the MERS* System, the mortgage is recorded in the name of the Mortgage Electronic Registration System, Inc. or MERS*, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the master servicer, registered electronically through the MERS* System. For each of these mortgage loans, MERS* serves as a mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the owner trustee, and does not have any interest in that mortgage loan.

The sale and servicing agreement will not require Countrywide to record assignments of the mortgage loans to the owner trustee, or the indenture trustee so long as the rating of the long-term senior unsecured debt obligations of Countrywide are not withdrawn, suspended or do not fall below a rating of "BBB" by Standard & Poor's or "Baa2" by Moody's or as long as no Event of Servicing Termination has occurred and not been waived. If Countrywide's long-term senior unsecured debt obligations rating does not satisfy the above-described standard (an "*Assignment Event*"), Countrywide will have 90 days to record assignments of the mortgages for each mortgage loan in favor of the indenture trustee (unless opinions of counsel satisfactory to the Rating Agencies to the effect that recordation of the assignments or delivery of the documentation is not required in the relevant jurisdiction to protect the interest of the indenture trustee in the mortgage loans).

Page S-74

In accordance with the sale and servicing agreement and the custodial agreement, within 180 days of the closing date with respect to the initial mortgage loans and within 180 days of the relevant subsequent transfer date with respect to Additional Home Equity Loans, the custodian will review the mortgage loans and the Related Documents. If any mortgage loan or Related Document is found to be missing or otherwise defective in any material respect and the defect

Page | 8

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

is not cured within 90 days following notification of it to the sponsor and the depositor by the indenture trustee, the sponsor must accept the transfer of the mortgage loan from the issuing entity. The principal balance of any mortgage loan so transferred will be deducted from the Loan Pool Balance, thus reducing the amount of the Transferor Interest. If the deduction would cause a Transfer Deficiency to exist, the sponsor must either transfer an Eligible Substitute Mortgage Loans to the issuing entity or make a deposit into the collection account of the Transfer Deposit Amount to the issuing entity. *See "Transfer Deficiency" and "Transfer Deposit Amount" under Maturity and Prepayment Considerations."* Except to the extent substituted for by an Eligible Substitute Mortgage Loan, the transfer of the mortgage loan out of the issuing entity will be treated under the sale and servicing agreement as a payment in full of the mortgage loan. Any Transfer Deposit Amount will be treated as principal collections. No transfer shall be considered to have occurred unless all required deposits to the collection account are actually made. The obligation of the sponsor to accept a transfer of a Defective Mortgage Loan and to make any required deposits are the sole remedies for any defects in the mortgage loans and Related Documents available to the owner trustee, the indenture trustee or the holders of the Notes. Any such mortgage loan shall only be substituted if such substitution occurs within two years of the Closing Date.

An *"Eligible Substitute Mortgage Loan"* is a mortgage loan transferred to the trust by the sponsor in connection with the substitution of a Defective Mortgage Loan that must, on the date of its transfer to the trust,

- have a principal balance (or in the case of a substitution of more than one mortgage loan for a Defective Mortgage Loan, an aggregate principal balance) outstanding that is not more than the Transfer Deficiency relating to the Defective Mortgage Loan;

- have a loan rate not less than the loan rate of the Defective Mortgage Loan and not more than 1.00% in excess of the loan rate of the Defective Mortgage Loan;

- have a loan rate based on the same index (prime rate) with adjustments to the loan rate made on the same Interest Rate Adjustment Date as that of the Defective Mortgage Loan;

- have a FICO score not less than the FICO score of the Defective Mortgage Loan and not more than 50 points higher than the FICO score for the Defective Mortgage Loan;

- have a margin that is not less than the margin of the Defective Mortgage Loan and not more than 100 basis points higher than the margin for the Defective Mortgage Loan;

- have a mortgage of the same or higher level of priority as the mortgage relating to the Defective Mortgage Loan;

- have a remaining term to maturity not more than six months earlier than the remaining terms to maturity of the Defective Mortgage Loan, not later than the maturity date of the LIBOR Notes, and not more than 60 months later than the remaining term to maturity of the Defective Mortgage Loan;

- comply with each representation and warranty regarding the mortgage loans in the sale and servicing agreement (deemed to be made as of the date of transfer to the trust);

- have an original combined loan-to-value ratio not greater than that of the Defective Mortgage Loan; and

- satisfy certain other conditions specified in the sale and servicing agreement.

The sponsor will make certain representations and warranties as to the accuracy in all material respects of certain information furnished to the indenture trustee, and the issuing entity with respect to each mortgage loan (e.g., cut-off date principal balance and loan rate). In addition, the sponsor will represent and warrant on the closing date,

Page | 9

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

Page S-75

or on each subsequent transfer date with respect to each Additional Home Equity Loan, that at the time of transfer to the depositor, the sponsor has transferred or assigned all of its interest in each mortgage loan and the Related Documents, free of any lien. Upon discovery of a breach of any representation and warranty that materially and adversely affects the interests of the issuing entity, the indenture trustee, or the holders of the Notes in the related mortgage loan and Related Documents, the sponsor will have a period of 90 days after discovery or notice of the breach to effect a cure. If the breach cannot be cured within the 90-day period, the sponsor must accept a transfer of the Defective Mortgage Loan from the issuing entity. The same procedure and limitations as in the second preceding paragraph for the transfer of Defective Mortgage Loans will apply to the transfer of a mortgage loan that must be transferred because of a breach of a representation or warranty in the sale and servicing agreement that materially and adversely affects the interests of the holders of the Notes.

Mortgage loans required to be transferred to the sponsor as described in the preceding paragraphs are referred to as "*Defective Mortgage Loans.*"

**http://www.sec.gov/Archives/edgar/data/1310402/000119312506041387/d424b5.htm**

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



Certified Forensic Loan Auditors

## SALE AND SERVICING AGREEMENT

**CWHEQ, INC.**
Depositor

**COUNTRYWIDE HOME LOANS, INC.**
Sponsor and Master Servicer

# CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2006-A
Trust

**JPMORGAN CHASE BANK, N.A.**
Indenture Trustee

---------------------------------

# SALE AND SERVICING AGREEMENT
Dated as of February 27, 2006

---------------------------------

## REVOLVING HOME EQUITY LOAN ASSET BACKED NOTES, SERIES 2006-A

http://www.sec.gov/Archives/edgar/data/1353881/000090514806002289/efc6-1063_exhibit991.txt

Page | 11

CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015
-All Rights Reserved-



**Certified Forensic Loan Auditors**

# SALE AND SERVICING AGREEMENT
## Sections 2.01 and 9.02

## Conveyance of Mortgage Loans

**Section 2.01 Conveyance of Mortgage Loans**; Retention of Obligation to Fund Advances Under Credit Line Agreements.

(a) Concurrently with the execution and delivery of this Agreement, the Depositor hereby transfers to the Trust without recourse (subject to Sections 2.02 and 2.04) all of its right, title, and interest in

(1) each Initial Mortgage Loan, including its Asset Balance (including all Additional Balances), the related Mortgage File, all property that secures the Mortgage Loan, and all collections received on it after the Cut-off Date (excluding payments due by the Cut-off Date);

(2) property that secured an Initial Mortgage Loan that is acquired by foreclosure or deed in lieu of foreclosure;

(3) the Depositor's rights under the Purchase Agreement;

(4) the Depositor's rights under the hazard insurance policies;

(5) all rights under any guaranty executed in connection with a Mortgage Loan;

(6) all other assets included or to be included in the Trust for the benefit of the Secured Parties; and

(7) all proceeds of the foregoing.

This transfer to the Trust is to the Owner Trustee, on behalf of the Trust, and each reference in this Agreement to this transfer shall be construed accordingly. In addition, by the Closing Date, the Depositor shall cause the Loan Insurance Policy Provider to deliver the Loan Insurance Policy to the Co-Trustee.

Page 3

(b) Additional Transfers; Conditions Precedent to Subsequent Additions.

(1) The Depositor may sell to the Trust Additional Home Equity Loans on any Subsequent Closing Date designated by the Depositor by the Latest Subsequent Closing Date. The Depositor shall notify the Owner Trustee, the Indenture Trustee, and each Rating Agency of its designation of a Subsequent Closing Date at least one Business Day in advance. On each Subsequent Closing Date the Depositor shall deliver a properly completed and executed Transfer Document to the Owner Trustee and furnish to the

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

Owner Trustee and the Indenture Trustee

    (A) the Officer's Certificate referred to in Section 2.01(b)(2)(H),

    (B) the revised Mortgage Loan Schedule reflecting the addition of the Additional Home Equity Loans covered by the Transfer Document,

    (C) an opinion of counsel relating to the Subsequent Closing Date to the effect that a court in a bankruptcy context addressing the transfer of the Additional Home Equity Loans would characterize the transfer as a sale rather than as a secured lending,

    (D) an opinion of counsel relating to the perfection of security interest in the Additional Home Equity Loans substantially in the form delivered on the Closing Date, and

    (E) an Opinion of Counsel to the effect that the purchase of Additional Home Equity Loans will not result in the imposition of the tax on prohibited transactions on the Trust or contributions after the Startup Date, as defined in Sections 860F(a)(2) and 860G(d) of the Code, respectively or cause any REMIC created under the Trust Agreement to fail to qualify as a REMIC,

and the Indenture Trustee shall pay, on behalf of the Trust, to the order of the Depositor, from the Additional Loan Account, the purchase price in an amount equal to the Cut-off Date Asset Balance specified in the Transfer Document, up to the amount of funds remaining in that Additional Loan Account.

    Upon delivery of the Transfer Document and payment of the purchase price, the Depositor hereby transfers to the Trust without recourse (subject to Sections 2.02 and 2.04) all of its right, title, and interest in each Additional Home Equity Loan identified in the Transfer Document, including its Asset Balance (including all Additional Balances) and all collections received on it after the relevant Subsequent Cut-off Date (excluding payments due by the Subsequent Cut-off Date) and all proceeds of the foregoing. This transfer to the Trust is to the Owner Trustee, on behalf of the Trust, and each reference in this Agreement to this transfer shall be construed accordingly.

    (2) The obligation of the Indenture Trustee on behalf of the Trust to pay the purchase price from the relevant Additional Loan Account for the benefit of the Depositor and the acceptance by the Owner Trustee of the transfer of the Additional Home Equity Loans and the other property and rights relating to them on the related

Page 4

Subsequent Closing Date are subject to the satisfaction of each of the following conditions by the Subsequent Closing Date:

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

(A) as of the related Subsequent Closing Date, neither the Sponsor nor the Depositor is insolvent nor shall either of them be made insolvent by the transfer of the Additional Home Equity Loans nor is either of them aware of any pending insolvency;

(B) the addition shall not result in a material adverse federal tax consequence to the Trust, the Transferor, or the Noteholders;

(C) the Subsequent Closing Date is not after the Latest Subsequent Closing Date;

(D) neither the Depositor nor the Trust shall have been advised in writing by any Rating Agency that the transfer of the Additional Home Equity Loans would result in a reduction or withdrawal of the Rating Agency's then current rating of the Notes;

(E) the Sponsor represents and warrants that on the Subsequent Closing Date each of the representations and warranties in Section 2.04(a) by virtue of repetition of Section 3.02(a) of the Purchase Agreement (excluding clauses (18), (30), (32), (33), and (34) of Section 3.02(a) of the Purchase Agreement) are true with respect to the Additional Home Equity Loans;

(F) the Sponsor represents and warrants that the addition of the Additional Home Equity Loans will not result in a significant variance as of the Subsequent Closing Date from the Mortgage Loan pool characteristics covered by the representations and warranties in Section 3.02(a)(18), (30), (32), (33), and (34) of the Purchase Agreement after taking into account the addition of the Additional Home Equity Loans;

(G) as of the relevant Subsequent Closing Date, the Sponsor is not aware of any mechanics' or similar liens or claims that have been filed for work, labor, or material affecting the related Mortgaged Property that are, or may be, liens prior or equal to the lien of the related mortgage, except liens that are fully insured against by the title insurance policy referred to in Section 3.02(16) of the Purchase Agreement; and

(H) the Depositor shall have delivered or caused the Sponsor to deliver to the Owner Trustee and the Indenture Trustee an Officer's Certificate confirming the satisfaction of each of these conditions precedent.

Neither the Owner Trustee nor the Indenture Trustee need investigate or otherwise verify compliance with these conditions, except for its receipt of the documents specified to be delivered to it in Section 2.01(b)(1), and they may rely on the Officer's Certificate specified in Section 2.01(b)(2)(H).

Page 5

(c) Additional Balances; Future Fundings. Additional Balances shall be

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

part of the Asset Balance and are hereby transferred to the Trust on the Closing Date for the Initial Mortgage Loans and on the relevant Subsequent Closing Date for the Additional Home Equity Loans pursuant to this Section 2.01, and therefore are part of the Trust property. Neither the Owner Trustee nor the Trust nor the Indenture Trustee assumes the obligation under any Credit Line Agreement that provides for the funding of future advances to the mortgagor under it, and neither the Trust nor the Owner Trustee nor the Indenture Trustee may fund these future advances.

(d) Delayed Delivery. In connection with the transfer under Section 2.01(a) by the Depositor, the Depositor shall effect delivery of the Mortgage Loan Schedule to the Trust and the Indenture Trustee by the Closing Date and delivery of the Initial Mortgage Files to the Trust, and the Trust shall deliver them to the Indenture Trustee,

> (1) no later than the Closing Date, with respect to no less than 50% of the Initial Mortgage Loans,

> (2) no later than the twentieth day after the Closing Date, with respect to no less than 40% of the Initial Mortgage Loans in addition to those delivered on the Closing Date, and

> (3) within thirty days following the Closing Date, with respect to the remaining Initial Mortgage Loans.

In connection with the transfers by the Depositor under Section 2.01(b), the Depositor shall effect delivery of a revised Mortgage Loan Schedule reflecting the addition of the Additional Home Equity Loans to the Indenture Trustee within 15 days following the relevant Subsequent Closing Date and of the relevant Initial Mortgage Files to the Custodian,

> (A) no later than the relevant Subsequent Closing Date, with respect to no less than 10% of the relevant Additional Home Equity Loans, and

> (B) within twenty days following the relevant Subsequent Closing Date, with respect to the remaining relevant Additional Home Equity Loans.

In lieu of delivery of original documentation, the Depositor may deliver documents that have been imaged optically on delivery of an opinion of counsel to the Indenture Trustee that the imaged documents are enforceable to the same extent as the originals and do not impair the enforceability of the transfer to the Trust of the Mortgage Loans, if the retention of the imaged documents in the delivered format will not result in a reduction in the then current rating of the Notes.

(e) Mark Records. The Sponsor hereby confirms to the Owner Trustee and the Indenture Trustee, on behalf of itself and any other Seller, that each Seller has caused the portions of the Electronic Ledgers relating to the Initial Mortgage Loans to be clearly and unambiguously marked, and has made the appropriate entries in its general accounting records, to indicate that the Initial Mortgage Loans have been transferred to the Trust at the direction

Page | 15

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*



**Certified Forensic Loan Auditors**

of the Depositor. The Master Servicer hereby confirms to the Owner Trustee and the Indenture

Page 6

Trustee that it has clearly and unambiguously made appropriate entries in its general accounting records indicating that those Initial Mortgage Loans constitute part of the Trust and are serviced by it on behalf of the Trust in accordance with this Agreement.

By the relevant Subsequent Closing Date, the Sponsor shall cause the portions of the Electronic Ledgers relating to the Additional Home Equity Loans to be clearly and unambiguously marked, and shall make appropriate entries in its general accounting records, to indicate that those Additional Home Equity Loans have been transferred to the Trust at the direction of the Depositor. By the relevant Subsequent Closing Date, the Master Servicer shall clearly and unambiguously make appropriate entries in its general accounting records indicating that those Additional Home Equity Loans constitute part of the Trust and are serviced by it on behalf of the Trust in accordance with this Agreement.

(f) UCC Filings. The Depositor and the Trust agree (subject to Section 2.01(h)) to effect any actions and execute any documents necessary to perfect and protect the Trust's, the Indenture Trustee's and the Secured Parties' interests in each Cut-off Date Asset Balance and Additional Balances and their proceeds, including filing all necessary Continuation Statements for the UCC1 Financing Statements filed in the State of Delaware (which shall have been filed by the Closing Date) describing the Cut-off Date Asset Balances and Additional Balances and naming the Depositor as debtor and the Trust as secured party or naming the Trust as debtor and the Indenture Trustee as secured party and any amendments to UCC1 Financing Statements required to reflect a change in the UCC or in the name or organizational structure of the Depositor or the Trust or the filing of any additional UCC1 Financing Statements due to the change in the state of organization of the Depositor or the Trust (within 30 days of any event necessitating the filing).

(g) Sponsor Rating Downgrade. If either an Event of Servicing Termination has occurred and not been waived or the long term senior unsecured corporate debt rating of Countrywide Home Loans, Inc. falls below "BBB" by Standard & Poor's or "Baa2" by Moody's, then as promptly as practicable but in any case within 90 days of the event, the Master Servicer shall, at its expense, either

(x) request that the Indenture Trustee deliver to it the original Assignment of Mortgage previously delivered to the Indenture Trustee pursuant to Section 2.01(d) and then record the Assignment of Mortgage in favor of the Indenture Trustee (which may be a blanket assignment if permitted by applicable law) in the appropriate real property or other records,

(y) deliver to the Indenture Trustee an Opinion of Counsel addressed to the Indenture Trustee to the effect that recording is not required to protect the Indenture Trustee's interest in the related Mortgage Loan or, in case a court should recharacterize the sale of the Mortgage Loans as a

Page | 16

*CERTIFIED FORENSIC LOAN AUDITORS, LLC COPYRIGHT 2007-2015*
*-All Rights Reserved-*